IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILLIAM A. BAUDLER, Regional Director
of the Thirty-Second Region of the
National Labor Relations Board, for
and on behalf of the National
Relations Board,

        Petitioner,

    v.

AMERICAN BAPTIST HOMES OF THE WEST,
doing business as PIEDMONT GARDENS,

        Respondent.

_____/

No. C 11-2480 CW

ORDER GRANTING
NLRB'S PETITION FOR
AN INJUNCTION UNDER
SECTION 10(j) OF THE
NATIONAL LABOR
RELATIONS ACT

    Regional Director of the Thirty-Second Region of the National
Labor Relations Board (NLRB) William A. Baudler, for and on behalf
of the NLRB, petitions for an injunction against Respondent
American Baptist Homes of the West pursuant to section 10(j) of the
National Labor Relations Act (NLRA), 29 U.S.C. § 160(j).
Respondent opposes the petition.  The petition was heard on June
30, 2011.  Having considered oral argument and the papers submitted
by the parties, the Court GRANTS Petitioner's request.

BACKGROUND

    In July and August 2010, Service Employees International
Union, United Healthcare Workers - West brought multiple unfair
labor practice charges against Respondent.  The Union contended
that Respondent violated section 8(a)(1), (3) and (5) of the NLRA,
29 U.S.C. § 158(a)(1), (3) and (5).  Based on these charges, on
March 24, 2011, the Acting General Counsel of the NLRB brought a
complaint against Respondent.  Unless otherwise stated, the facts

United States District Court

For the Northern District of California

below are from the record developed in the administrative proceedings initiated by the Acting General Counsel.[1]

Respondent operates the Piedmont Gardens senior living community, located in Oakland, California.  The facility provides assisted living and skilled nursing services to approximately 300 residents.  The Union represents between 100 and 125 employees in Piedmont Gardens's nursing, dietary, resident service, and "general and administration" departments.  EX 754; Morgenroth Decl. ¶ 7.

In February 2010, members of the Union's bargaining committee began negotiations with Respondent for a new collective bargaining agreement (CBA).  The most recent CBA was set to expire on April 30, 2010.  The parties were not able to conclude a new CBA by June 2010.

On June 17 and 18, 2010, the Union conducted a strike authorization vote in Piedmont Gardens's employee break room.  While the vote was being held, Piedmont Gardens's Executive Director Gayle Reynolds asked three Union-member employees, who were assisting with the vote, to leave the premises.  On June 17, Reynolds asked Sheila Nelson, an employee and bargaining committee member, to leave.  The following morning, Reynolds asked Faye Eastman and Geneva Henry, two Union-member employees, to leave.  Ultimately, the employees voted to authorize the bargaining committee to call a strike if the committee believed it to be necessary.

In ejecting Nelson, Eastman and Henry, Reynolds relied on the facility's so-called "No-Access Rule," which provides:

---

[1] All citations to the administrative hearing record bear the prefix "EX."

United States District Court

For the Northern District of California

> Employees may not clock-in for duty before their shift
> begins, nor are they to remain on the grounds after the
> end of their shift, unless previously authorized by their
> supervisor.  Employees must have supervisor authorization
> before working/incurring overtime.

EX 935, 952.  According to Reynolds, Respondent does not "generally police the employees" with respect to the rule, but instead "expect[s] them to follow" it.  EX 384:18-19.  Reynolds could recall only one instance, before the strike vote, when the rule had been enforced.  Indeed, before June 2010, Nelson had attended at least two to three Union meetings in the break room.  Sanjanette Fowler, another employee and member of the bargaining committee, likewise conducted Union business "numerous times" on the premises on her days off.  EX 220:22.

On July 9, 2011, after a fruitless negotiating session, the bargaining committee called for a strike.  In a letter dated July 9, 2010, the Union informed Reynolds that members "will commence a strike at 5:00 a.m. on Monday, August 2, 2010 and continue such activity unless and until a mutually agreeable resolution has been reached."  EX 991.  In a separate letter dated July 9, 2010, the Union stated, "All employees participating in the Unfair Labor Practice strike and withdrawal of labor at Piedmont Gardens are scheduled to begin at 5:00 AM on Monday, August 2, 2010 unconditionally offer to return to work at or after 5:00 AM on Saturday, August 7, 2010."  EX 993.

On August 2, 2010, approximately eighty Union-member employees went on strike; roughly twenty Union-member employees stayed on the job.  Respondent hired approximately sixty to seventy temporary workers and, by the evening of August 2, it believed that it had sufficient personnel to get through the strike.  Beginning on

**United States District Court**
For the Northern District of California

August 3, Respondent began making permanent offers of employment to the temporary employees. It continued to do so on each day of the strike, even though the Union had reaffirmed by fax its previous unconditional offer to have members return to work "at or after 5:00 AM on Saturday, August 7, 2010." EX 366-67, 993. With respect to the newly-hired employees, Reynolds stated,

> I knew that it would take time to acclimate the new employees to Piedmont Gardens, but the more important consideration for me was that I knew that those replacements would come to work if there was another work stoppage. I assumed that because these people were willing to work during this strike, they'd be willing to work during the next strike.

EX 360:10-17.

During the evening of August 6, 2011, the last day of the strike, the Union's attorney Bruce Harland and Respondent's attorney David Durham conversed by telephone about the replacement of strikers. Harland contends that Durham told him that Respondent intended to "permanently replace about 20 or so employees" because "Piedmont Gardens wanted to teach the strikers and the Union a lesson." EX 203:8-9, 24-25. Durham disputes Harland's recollection of their conversation. Durham recalls telling Harland that twenty to twenty-five Union-member employees would be permanently replaced, but asserts that he did not state that the intent was "to teach the strikers and the Union a lesson." Instead, Durham maintains that he stated, "Bruce, we all know permanent replacements happen in strikes." EX 588:15-16.

Respondent extended forty-four offers of permanent employment during the strike. As a result, thirty-eight of the approximately eighty strikers were denied reinstatement to their original positions. Since then, Respondent has offered thirty of the

4

thirty-eight "substantially equivalent or alternative positions."[2]
Morgenroth Decl. ¶ 9.  However, it has reinstated only thirteen
Union strikers to their original positions.

In an affidavit dated March 15, 2011, Myriam Escamilla, the
Union's Nursing Home Division Director, asserts that "the Union has
lost the support of the members who went back to work."  EX 1004.
She notes that no more than two presently-working Union members at
Piedmont Gardens attended "two pickets and several candlelight
vigils at the facility in support of the replaced strikers."  Id.
She also points to the absence of any presently-working Union
members at a luncheon at the Union hall intended to "rebuild
camaraderie among the members."  Id.  Finally, Escamilla contends
that, as of the date of her affidavit, the "Union hasn't filed a
single grievance since the strike."  EX 1005.  Respondent disputes
this point with evidence that, on February 7, 2011, the Union
presented it with a grievance by Matilda Imbukwa, a Piedmont
Gardens employee.

A new CBA has yet to be concluded.  In its absence, Respondent
continues to follow the expired CBA.

Petitioner seeks an injunction, to be in effect pending the
disposition of the NLRB proceedings, that enjoins Respondent from:

> (1)  Maintaining and enforcing a rule denying off-duty
>      employees access to its premises for union activity while
>      allowing off-duty employee access to its premises for
>      other reasons;
>
> (2)  Refusing to reinstate employees to their former positions
>      of employment because the employees joined or assisted
>      the Union including participating in a strike, or because

[2] Respondent defines "substantially equivalent" to mean
"positions with identical titles, employment status, and shifts."
Morgenroth Decl. ¶ 8.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1                           they engaged in other protected concerted activities for
2                           the purpose of collective bargaining or other mutual aid
                            or protection;

3       (3)    In any like or related manner interfering with,
4                      restraining or coercing its employees in the rights
                       guaranteed them under Section 7 of the Act.

5  He also requests that the injunction provide the following forms of

6  affirmative relief, among others: (1) rescission of the

7  Respondent's "discriminatory policy of denying off-duty employees

8  access to its premises for union activity;" and (2) offering Union-

9  member employees reinstatement to "their former positions and

10 previous wages and working conditions."

11                              DISCUSSION

12      Under section 10(j) of the NLRA, the NLRB may petition "any

13 United States district court, within any district wherein the

14 unfair labor practice in question is alleged to have occurred or

15 wherein such person resides or transacts business, for appropriate

16 temporary relief or restraining order."  29 U.S.C. § 160(j).

17 Section 10(j) authorizes a court to issue an injunction if doing so

18 would be "just and proper."  Id.  In rendering its decision, a

19 court must keep "in mind that the underlying purpose of Section

20 10(j) is 'to protect the integrity of the collective bargaining

21 process and to preserve the Board's remedial power while it

22 processes the charge.'"  McDermott v. Ampersand Publ'g, LLC, 593

23 F.3d 950, 957 (9th Cir. 2010) (quoting Miller ex rel. NLRB v. Cal.

24 Pac. Med. Ctr., 19 F.3d 449, 455 (9th Cir. 1994), abrogated in part

25 by, Winter v. Natural Resources Defense Council, Inc., ___ U.S.

26 ___, 129 S. Ct. 365 (2008)).

27      Courts apply "the traditional equitable criteria used in

28 deciding whether to grant a preliminary injunction" when

determining whether to grant a section 10(j) injunction.
McDermott, 593 F.3d at 957. Thus, to obtain a section 10(j)
injunction, Petitioner must "establish that he is likely to succeed
on the merits, that he is likely to suffer irreparable harm in the
absence of preliminary relief, that the balance of equities tips in
his favor, and that an injunction is in the public interest." 129
S. Ct. at 374. Alternatively, "a preliminary injunction could
issue where the likelihood of success is such that serious
questions going to the merits were raised and the balance of
hardships tips sharply in" Petitioner's favor, so long as
Petitioner also demonstrates a likelihood of irreparable harm and
that preliminary relief is in the public interest. Alliance for
the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).[3]

    A.   Likelihood of Success on the Merits

    "On a § 10(j) petition, likelihood of success is a function of
the probability that the Board will issue an order determining that
the unfair labor practices alleged by the Regional Director
occurred and that [a reviewing appellate court] would grant a
petition enforcing that order, if such enforcement were sought."
Frankl ex rel. NLRB v. HTH Corp., ___ F.3d ___, 2011 U.S. App.
LEXIS 14312, at *49 (9th Cir.).[4] The Ninth Circuit recently

---

    [3] Respondent suggests that Cottrell does not apply to this
case because it was an "environmental case." Opp'n at 16 n.10.
This is unpersuasive. Winter, on which McDermott relies, was, like
Cottrell, a case involving claims under the National Environmental
Policy Act of 1969.

    [4] The parties previously disputed the effect of Winter on
Miller. Frankl, which was decided subsequent to McDermott and
Small v Operative Plasterers' Int'l Ass'n, 611 F.3d 483 (9th Cir.
2010), addresses this question. Although the mandate in Frankl has
                                                    (continued...)

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

explained in <u>Frankl</u>,

> [I]n evaluating the likelihood of success, "it is
> necessary to factor in the district court's lack of
> jurisdiction over unfair labor practices, and the
> deference accorded to NLRB determinations by the courts
> of appeals."  It is, after all, the Board and not the
> courts, which "has primary responsibility for declaring
> federal labor policy."  Additionally, and for similar
> reasons, "even on an issue of law, the district court
> should be hospitable to the views of the General Counsel,
> however novel."  Given these considerations, it remains
> the case -- whether or not the Board itself approved the
> filing of the § 10(j) petition -- that the regional
> director in a § 10(j) proceeding "can make a threshold
> showing of likelihood of success by producing some
> evidence to support the unfair labor practice charge,
> together with an arguable legal theory."

<u>Id.</u> at *50 (quoting <u>Miller</u>, 19 F.3d at 460).

   1. Application of No-Access Rule During Strike Vote

   Petitioner contends that Reynolds's expulsion of Nelson,

Eastman and Henry during the June 2010 strike authorization vote,

based on Respondent's No-Access Rule, violated section 8(a)(1) of

the NLRA.  This section prohibits interfering with, restraining, or

coercing employees in the exercise of their collective bargaining

rights under section 7 of the Act.  29 U.S.C. § 158(a)(1).

   "An employer has a basic property right to regulate and

restrict employee use of company property."  <u>Guard Publ'g Co.</u>, 351

NLRB 1110, 1114 (2007) (citation and internal quotation marks

omitted).  However, "in enforcing its rules," an employer "may not

discriminate against Section 7 activity."  <u>Id.</u> at 1117.  Under NLRB

precedent, "unlawful discrimination consists of disparate treatment

of activities or communications of a similar character because of

---

   ⁴(...continued)
not yet issued, the decision "is nevertheless final for such
purposes as stare decisis, and full faith and credit, unless it is
withdrawn by the court."  <u>Wedbush, Noble, Cooke, Inc. v. SEC</u>, 714
F.2d 923, 924 (9th Cir. 1983).

their union or other Section 7-protected status." Id. at 1118.

The evidence supports a conclusion that this charge likely will be sustained. The record demonstrates that Respondent seldom enforced the No-Access Rule, which permits a reasonable inference that Reynolds singled out Nelson, Eastman and Henry for expulsion because they were facilitating the strike authorization vote. Respondent offers no other reason why the No-Access Rule was enforced on this particular occasion. Although Respondent may have previously permitted off-duty Union-member employees to participate in Union-related activities in the break room, this does not extinguish the likelihood that discriminatory enforcement will be found in this case.

Accordingly, the Court concludes that there is a likelihood of success on the charge based on Nelson's, Eastman's and Henry's ejection. Injunctive relief ordered by the Court based on this charge will be directed at Respondent's discriminatory enforcement of the No-Access Rule. See Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust, 636 F.3d 1150, 1160 (9th Cir. 2011) (stating that "injunctive relief . . . must be tailored to remedy the specific harm alleged") (citation and internal quotation and editing marks omitted; emphasis in original).

2.    Failure to Reinstate Striking Employees

Petitioner asserts that Respondent's failure to reinstate Union-member employees who participated in the August 2010 strike to their previous positions violated section 8(a)(3), which prohibits an employer from engaging in "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

29 U.S.C. § 158(a)(3).  Respondent counters that it was entitled to deny reinstatement based on <u>NLRB v. Mackay Radio & Telegraph Co.</u>, 304 U.S. 333 (1938).  <u>Mackay</u> and its progeny provide that it is not an unfair labor practice for an employer not to reinstate employees involved in a strike over economic conditions[5] so long as it has a legitimate and substantial business justification; such a justification is the hiring of permanent replacement employees. <u>See</u> <u>Mackay</u>, 304 U.S. at 345-46; <u>NLRB v. Fleetwood Trailer Co.</u>, 389 U.S. 375, 378 (1967).

Petitioner does not dispute that the August 2010 strike was an economic one.  Instead, he cites <u>Hot Shoppes, Inc.</u>, 146 NLRB 802 (1964), which he contends provides an unlawful-purpose exception to the <u>Mackay</u> rule.  There, the NLRB construed <u>Mackay</u> to provide an employer with "a legal right to replace economic strikers at will" and to hold "that the motive for such replacements is immaterial, absent evidence of an independent unlawful purpose."  146 NLRB at 805.  Respondent contends that <u>Hot Shoppes</u> does not provide an exception to <u>Mackay</u> and that its discussion of an independent unlawful purpose is dicta.

Since <u>Hot Shoppes</u>, other NLRB and federal court decisions have acknowledged an unlawful-motive exception to the <u>Mackay</u> rule.  In a 2004 decision, the NLRB stated that, although "an employer's motive for hiring permanent replacements is immaterial," a violation of the NLRA "will still lie if it is shown that, in hiring the permanent replacements, the employer was motivated by 'an

---

[5] In contrast, employees "striking in protest of an employer's unfair labor practices" are entitled to reinstatement upon an unconditional offer to return to work.  <u>NLRB v. Int'l Van Lines</u>, 409 U.S. 48, 51 (1972).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  independent unlawful purpose.'" <u>Church Homes, Inc. d/b/a Avery</u>

2  <u>Heights</u>, 343 NLRB 1301, 1305 (2004), <u>vacated on other grounds by</u>,

3  <u>New England Health Care Employees Union v. NLRB</u>, 448 F.3d 189 (2d

4  Cir. 2006).  The Second Circuit vacated the 2004 <u>Avery Heights</u>

5  decision because it reflected an unwarranted inference by the NLRB.

6  <u>New England Health Care Employees Union</u>, 448 F.3d at 193.  However,

7  the court reiterated that the NLRA "is violated if 'an independent

8  unlawful purpose' motivated the hiring of permanent replacements."

9  <u>New England Health Care Employees Union</u>, 448 F.3d at 192 (citing

10  <u>Hot Shoppes</u>); <u>see also</u> <u>Indep. Fed. of Flight Attendants v. Trans</u>

11  <u>World Airlines, Inc.</u>, 1989 WL 60281, at *3 (W.D. Mo.) (noting that

12  the "independent unlawful purpose" exception provides "a minuscule

13  loophole in the <u>Hot Shoppes</u> rule").

14      While no precedential case has applied the unlawful-motive

15  exception,[6] as Respondent notes, this does not bar its application.

16  The <u>Hot Shoppes</u> exception is not inconsistent with <u>Mackay</u> or its

17  progeny, as Respondent suggests.  As noted above, Supreme Court

18  precedent provides that an employer may deny economic strikers

19  reinstatement only if it has a legitimate and substantial business

20  reason.  An independent unlawful purpose is not a legitimate and

21  substantial business reason.  Respondent cites <u>Belknap, Inc. v.</u>

22  <u>Hale</u>, 463 U.S. 491 (1983), to assert that "the Supreme Court

23  rejected an argument that an employer may not hire permanent

24

25      [6] On remand, the NLRB applied the exception in the <u>Avery</u>
   <u>Heights</u> case under its law-of-the-case doctrine.  <u>See</u> 350 NLRB 214,

26  214 (2007).  However, "'Law of the Case' decisions do not represent
   the general position of the Board and are not binding authority on

27  administrative law judges in cases other than the single specific
   case under discussion."  <u>Raley's Inc.</u>, 311 NLRB 1244, 1249 n.7

28  (1993).

United States District Court

For the Northern District of California

replacements unless the employer could prove that it was 'necessary to secure the manpower to keep the business operating.'" Opp'n at 17:13-15 (emphasis omitted). However, Belknap did not concern the scrutiny applicable to an employer's decision to hire permanent replacements. See Belknap, 463 U.S. at 504 n.8 (stating that this "issue is not posed in this case"). Further, Petitioner does not argue that Respondent has the burden of proof. He acknowledges that the Acting General Counsel carries the burden to show that Respondent had an independent unlawful purpose when it hired permanent replacements.

Petitioner proffers sufficient evidence of an independent unlawful purpose. First, he points to Reynolds's comment that "the more important consideration" for her was "that because [the replacements] were willing to work during this strike, they'd be willing to work during the next strike." A fact-finder could reasonably infer from this statement that Reynolds specifically sought to replace strikers with individuals who would not vote to strike in the future. This inference is bolstered by the fact that Respondent continued to hire permanent replacements during the strike, even though the Union reaffirmed the strikers' unconditional commitment to return to work on August 7.[7]

---

[7] Respondent contends that it was not certain that the striking employees would resume work on August 7th as promised because the Union stated in one letter that the strike would continue "unless and until a mutually agreeable resolution has been reached." However, Respondent's concern is belied by a letter, sent the same day, that stated that the employees "unconditionally offer to return to work at or after 5:00 AM on Saturday, August 7, 2010." Reynolds admitted that this unconditional offer was also faxed to Piedmont Gardens during the strike. Respondent insists that the unconditional offer was open-ended because it stated that
(continued...)

Petitioner also cites Harland's disputed assertion that Durham told him that, by permanently replacing the strikers, Respondent wanted to teach a lesson to the striking employees and the Union. Durham strenuously contests Harland's account of their conversation.  However, a "conflict in the evidence does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction." Scott ex rel. NLRB v. Stephen Dunn & Assocs., 241 F.3d 652, 662 (9th Cir. 2001), abrogated on other grounds by, Winter, 129 S. Ct. at 375-76.  If credited by a fact-finder, Harland's account would demonstrate an improper purpose in hiring permanent replacements.

Respondent contends that, even if the Court were to accept Petitioner's interpretation of Reynolds's statement and credit Harland's recollection, an independent unlawful purpose has not been shown.  Respondent argues that such a purpose requires an "unlawful objective that is extrinsic to the strike."  Opp'n at 20. However, it cites no authority to support this interpretation. Even if an extrinsic objective were required, Reynolds's statement and Durham's alleged comment could be viewed as reflecting Respondent's intention to oust the Union.  Such a purpose would be extrinsic to the strike.

Consequently, the Court concludes that the NLRB is likely to sustain the charge based on Respondent's failure to reinstate the striking Union-member employees.  Petitioner presents an arguable legal theory supported by the evidence.

---

[7](...continued)
the employees would resume work "at or after 5:00 AM."  Despite its purported confusion about this point, Respondent never contacted the Union to clarify the meaning of the letter.

B.   Likelihood of Irreparable Harm

While "a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." <u>Frankl</u>, 2011 U.S. App. LEXIS 14312, at *69.  A "likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances." <u>Id.</u> at *71.

Petitioner relies primarily on Escamilla's affidavit to argue that the Union and its members at Piedmont Gardens are likely to suffer irreparable harm with respect to Respondent's failure to reinstate all of the strikers.  He contends that the significant drop in employee support of the Union hampers its ability to bargain.  He asserts that reinstating all of the strikers is necessary to reassure current employees that they may support the Union without fearing retaliation by Respondent.  Respondent argues that Escamilla's affidavit must be discounted in its entirety because it contains hearsay and is based on speculation, not personal knowledge.  Respondent also notes Petitioner's delay in seeking a section 10(j) injunction.

Escamilla, as Director of the Union's Nursing Home Division, likely has personal knowledge of member participation in the Union-sponsored luncheon, pickets and candlelight vigils and of the presently-stalled bargaining process.  She asserts that, before the August 2010 strike, approximately eighty to ninety percent of

14

United States District Court

For the Northern District of California

Union-member employees participated in pickets.  Respondent does not contest this figure or that, at most, two presently-working Union members have participated in Union activities since the strike.  Nor does Respondent dispute Escamilla's contention that the parties have not negotiated since August 17, 2010, when Respondent proposed lower wages and an open-shop arrangement. Respondent contends that Escamilla fails to show a causal link between the diminished support for the Union and Respondent's alleged unfair labor practices.  However, it is reasonable to assume that Respondent's ejection of Union-member employees from the premises during the strike authorization vote and refusal to reinstate strikers have chilled member engagement.

That Petitioner did not seek a section 10(j) injunction until two months after the Acting General Counsel filed his complaint against Respondent does not suggest that irreparable harm is not likely to occur.  Indeed, Petitioner sought an injunction shortly after the administrative proceedings concluded.  Further, delay, on its own, "is not a determinative factor in whether the grant of interim relief is just and proper." McDermott, 593 F.3d at 965 (citation and internal quotation marks omitted).  Respondent points to no other factors, viewed together with Petitioner's brief delay, that show an injunction to be inappropriate.

As noted above, the purpose of section 10(j) is to protect the integrity of the collective bargaining process.  Petitioner marshals sufficient evidence that Respondent's alleged unlawful conduct has harmed Union-member employees' ability to bargain collectively.  Consequently, the Court concludes that Petitioner has met his burden to show a likelihood of irreparable harm with

1   respect to Respondent's failure to reinstate all of the strikers.

2        C.   Balance of Equities

3        Petitioner contends that the equities weigh in favor of

4   issuing an injunction because, without interim relief, the Union

5   will be unable to bargain collectively and advance employees'

6   interests.  Respondent asserts that the equities weigh in its favor

7   because, if required to reinstate all strikers, it "will have more

8   employees than positions available."  Opp'n at 27:19.  It suggests

9   that it will have to make additional unemployment insurance

10  payments, which would hurt its business.

11       When "considering the balance of hardships, the district court

12  must take into account the probability that declining to issue the

13  injunction will permit the allegedly unfair labor practice to reach

14  fruition and thereby render meaningless the Board's remedial

15  authority."  Miller, 19 F.3d at 460.  Here, approximately 100 to

16  125 represented employees have worked without a new CBA for over a

17  year, and Petitioner has proffered evidence suggesting that

18  Respondent's alleged unlawful labor practices have interfered with

19  the collective bargaining process.  Although Respondent complains

20  that the permanent replacements may be harmed if an injunction is

21  granted, the record suggests that any harm stems from Respondent's

22  decisions that were motivated by an independent unlawful purpose.

23  Absent interim relief, the chilling effect of Respondent's conduct

24  will not be dissipated.  Further, the remaining strikers who have

25  not been reinstated may seek other employment, rendering moot

26  relief by the NLRB.

27       Accordingly, the Court concludes that the equities favor the

28  entry of an injunction.

**United States District Court**
For the Northern District of California

1    D.   Public Interest

2    "In § 10(j) cases, the public interest is to ensure that an

3  unfair labor practice will not succeed because the Board takes too

4  long to investigate and adjudicate the charge.  Thus, courts must

5  consider the extent to which this interest is implicated under the

6  circumstances of the particular case."  <u>Miller</u>, 19 F.3d at 460.

7  Here, based on the facts of this case, the Court finds that interim

8  relief is in the public interest.  Respondent does not argue

9  otherwise.

10                           CONCLUSION

11    For the foregoing reasons, the Court GRANTS Petitioner's

12  request for a section 10(j) injunction.  An injunction will issue

13  as a separate order.

14    The Court stays the injunction for fourteen days so that

15  Respondent may seek a stay from the Ninth Circuit.  If the Ninth

16  Circuit does not grant a stay within this period, Respondent shall

17  comply with the injunction and offer interim reinstatement to the

18  affected employees within fourteen days of the date the stay period

19  expires.

20    IT IS SO ORDERED.

21

22  Dated: July 19, 2011
                                    _____
23                                  CLAUDIA WILKEN
                                    United States District Judge

24

25

26

27

28

                              17